NOT DESIGNATED FOR PUBLICATION

No. 128,378

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of W.E.W., a Minor Child.

MEMORANDUM OPINION

Appeal from Harper District Court; SCOTT MCPHERSON, magistrate judge. Submitted without oral argument. Opinion filed August 15, 2025. Reversed and remanded with directions.

*Chay Howard*, of Greensburg, for appellant natural mother.

No appearance by appellee.

Before COBLE, P.J., ISHERWOOD and HURST, JJ.

PER CURIAM: Mother appeals the district court's determination that her son, W.E.W., was a child in need of care in August 2024 due to her inability to adequately provide for his care or control. The record demonstrates a failure to properly apply the law and consider Mother's fundamental right to the care, custody, and control of her child on several occasions and at multiple levels. At the time of the child in need of care adjudication, Mother was available and willing to care for W.E.W. and there was not clear and convincing evidence to support the finding that W.E.W. was a child in need of care as to Mother. While panels of this court have found a child may be adjudicated as a child in need of care as to one parent, such a finding does not inure to the detriment of the other parent without meeting the applicable legal standard as to that parent.

1

The district court's decision is reversed. On remand, if the State seeks to establish W.E.W. as a child in need of care as to Mother, the district court must make that determination based on the then existing facts relevant to Mother using the appropriate legal standard as set forth in this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 10, 2024, 11-year-old W.E.W. was staying with Misty, a friend of W.E.W.'s Father. Misty called the police and reported that she wanted to immediately relinquish custody of W.E.W. because she was not receiving any funds for his care. The responding officer contacted the Kansas Department for Children and Families (DCF) and informed them that W.E.W. was being brought into the police station.

The day after Misty took W.E.W. to the police station, the State filed a petition under K.S.A. 38-2234 alleging W.E.W. was a child in need of care (CINC) based on two statutory grounds: (1) W.E.W. "is without adequate parental care, control or subsistence and it is not due solely to the lack of financial means of the child's parents or other custodian" and (2) W.E.W. "is without care or control necessary for the child's physical, mental or emotional health." See K.S.A. 2024 Supp. 38-2202(d)(1)-(2). As factual support, the petition stated that W.E.W. was temporarily staying with Misty, who wished to "'relinquish her rights'" and was unwilling to continue caring for him, and that Father was also unable to take him. The petition did not mention Mother.

*History of the case*

According to Mother's testimony at the CINC hearing on August 27, 2024, Mother and Father had joint custody of W.E.W., who stayed with Father during the school week because Father lived in the preferred school district. Mother lived in Wichita and Father

2

lived in Anthony, approximately an hour apart. During that time, W.E.W. stayed with Mother on occasional weekends, school holidays, and during the summer.

A DCF supervisor, Marissa Thorne, testified that they investigated a report about Father on February 12, 2024—almost six months before W.E.W. entered DCF custody—for alleged lack of supervision and emotional abuse of W.E.W. After their investigation, DCF "affirmed for lack of supervision" only. According to the supervisor, no action was taken at the time because Father was under court supervision for a criminal case, and the county attorney believed the concern could be managed under that case. Soon after that investigation, Father was arrested and W.E.W. went to stay with Mother. Mother testified that everything was going well and that she told Father W.E.W. could return to him once Father's court case was resolved.

According to Thorne's testimony, the only report of a concern regarding Mother's ability to care for W.E.W. occurred in March 2024 while W.E.W. was in Mother's custody during Father's incarceration. W.E.W. told someone a fight occurred at Mother's home where a knife was pulled. When asked about the incident at the CINC hearing, Mother said W.E.W. was asleep in her home when her ex—whom she had told to stay away from her—came to Mother's house uninvited and threatened a friend of Mother's. Her friend called the police, who arrived and arrested the aggressor. Mother explained that she had not seen or had contact with the aggressor since the incident. Thorne testified that after the investigation, they "did not have enough evidence to say that that occurred or that it had a negative impact on [W.E.W.]."

Additionally, when testifying about the March 2024 incident report, the DCF supervisor said there were "concerns that Father was going to the Mother to get drugs to sell." The supervisor did not provide a timeline for those concerns—which is notable, given that Father was in jail at the time of the March 2024 incident report—nor did they give any evidence supporting the concern. Later, Dr. Phil Ibbetson, a special investigator

3

from DCF, testified that the police report of the March 2024 incident did not indicate concerns about Mother using or selling drugs.

*Father became unavailable.*

Consistent with W.E.W.'s desire, at the conclusion of Father's criminal case, W.E.W. returned to stay with Father to finish the school year at his original school. Unfortunately, on May 16, 2024, soon after W.E.W. returned to Father's home, DCF received a report that Father had failed a drug test. Father's probation officer confirmed to DCF that Father violated his probation and was going to serve a jail sanction and then attend treatment. Mother testified that when Father told her he was entering a 28-day substance abuse treatment program, she expected W.E.W. would return to her home, but Father arranged for W.E.W. to stay in the neighborhood with Father's friend, Misty.

DCF held a Team Decision Making (TDM) meeting in mid-May that Mother attended, but Father was absent. Thorne testified that DCF was "hesitant" to have W.E.W. return to Mother's home, but they "had no proof of any, you know, concerns regarding [Mother]." The supervisor testified there were "a lot of reports concerning domestic violence, police interaction at [Mother's] home" and "substance use" but did not identify the date of those reports or substantiate allegations that prevented W.E.W. from living with Mother. According to DCF, they decided as a group—which included Mother—to have W.E.W. temporarily remain with Misty.

According to the testimony of multiple DCF workers and Mother, W.E.W. stayed with Misty during Father's substance abuse treatment because Mother agreed—not because of any determination related to Mother's ability to care for him. Though Mother was initially hesitant and wanted W.E.W. to return to her home, she agreed to let him stay with Misty after hearing the summer plans Misty had for him and knowing that W.E.W. wanted to stay near his friends. DCF told Mother at the TDM meeting that she

4

maintained custody of W.E.W. and that she could change her mind at any time. There was no definitive plan for W.E.W.'s return, and according to Mother, she only agreed to allow W.E.W. to stay with Misty temporarily and wanted him to return to her home.

*Staying with the family friend*

Though W.E.W. reported he enjoyed his time with Misty, a communication issue emerged. Mother was unable to speak directly with W.E.W. from the middle of May until Misty took W.E.W. to the police department in early July. Mother testified that she contacted Misty to speak to W.E.W. but that Misty said he was unable to speak for various reasons such as being at camp or the pool. Mother said she had texted, called, and messaged Misty for at least a week prior to the day Misty took W.E.W. to the police station. Mother also contacted Father and asked him to have Misty call her. She was essentially shut out by Father and Misty for no apparent reason.

In July 2024, before turning W.E.W. over to the police, Misty contacted DCF to complain about keeping W.E.W. without financial compensation. As a result, DCF began considering other placement options. In a phone call, Mother told DCF that she wanted W.E.W. to return to her home. The DCF supervisor explained that they "had multiple concerns reported to [DCF] for drug use, not just in this investigation but in several other investigations for [Mother] and her other children in Wichita" and that a worker in Wichita said Mother was not cooperating with the Wichita workers in their investigation.

Apparently because of these "concerns" of possible drug use in Mother's home, DCF requested that Mother conduct a drug screen. However, a DCF child protection specialist investigating in July, Phillip Levy, testified that he never told Mother why he needed the drug screen and he did not know whether anyone had ever told Mother that failure to complete the drug screen could cause her to lose custody of her son. Mother testified that she asked for the reason for the test and was never told she needed to

5

complete the drug screen to avoid losing custody of W.E.W. In fact, Mother testified that DCF told her there were issues in the case involving Father's other child—not W.E.W. Mother said she refused the drug test over the phone because she was unwilling to be involved in "another child's case." Levy also testified that during the call, Mother told him she wanted W.E.W. in her home.

*Misty leaves W.E.W. at the police department.*

When Misty took W.E.W. to the police department on July 10, 2024, to relinquish W.E.W., the responding officer contacted DCF and juvenile intake services—but never contacted Mother or Father. After a few hours at the police station, W.E.W. was taken to the Andover Children's Home. According to Mother, she was not aware W.E.W. was taken into police custody until the county clerk called on July 11 to notify her of the temporary custody hearing taking place the next day.

The State filed a CINC petition on July 11, 2024, with very limited factual support that said nothing about Mother or her home but alleged:

> "Child was placed with [Misty] through a temporary guardianship arrangement with child's father. [Misty] contacted law enforcement to 'relinquish her rights' to the child. Child is now without adequate care due to father's substance abuse and ongoing legal cases and the guardian's unwillingness to continue caring for the child."

The Harper County District Court entered an ex parte order placing W.E.W. into DCF custody and set a temporary custody hearing for the next day. Mother appeared at the temporary custody hearing pro se via video conference and did not speak. The district court ordered W.E.W. to remain in DCF custody outside of his parents' homes, gave The Family Initiative (TFI) discretion over W.E.W.'s nonparental placement, and ordered that

both parents submit to hair follicle drug testing by July 26, 2024, stating, "No visits to occur without negative drug test results."

Mother attended a case plan meeting with TFI via phone on August 5, 2024, and a few days later TFI texted Mother to set up an in-person meeting. However, due to TFI's scheduling issues, they could not meet with Mother in person until August 26—the day before the CINC hearing. Mother asked to meet in a park because she was not comfortable meeting with anyone in her home; Mother testified that her daughter had recently moved out and she was embarrassed because she felt her house was busy and disorganized. No one at DCF or TFI told Mother she was required to meet with them at her home.

*CINC adjudication hearing*

On August 27, 2024, the district court held the CINC adjudication hearing where the court heard evidence of Father's incarceration and his refusal to cooperate with DCF, the DCF concerns and reports, and Mother's failure to complete a drug screening or have a home walk-through. Mother said after the court's order for a drug screening on July 12, 2024, that "they never told [her] anything about getting it done," but she agreed the court mentioned it at a separate hearing on August 6. Mother testified that DCF was aware of her transportation limitations and that although she intended to complete the test, she first wanted to speak to a lawyer. As of the CINC adjudication, Mother had not completed the drug screening.

Mother testified that the day W.E.W. went into custody on July 10, she had a suitable home which she described as a three-bedroom, one-and-a-half bath house with a big yard in a quiet neighborhood. She said she lived alone, had W.E.W.'s room set up, and had turned another room into a craft room for them both. Mother also had income from her disability payments.

Though DCF visited Mother's home in May 2024—just three months before the CINC adjudication hearing—they did not request or conduct a walk-through at that time. When a DCF employee later went to Mother's home to conduct a walk-through, she was not home. The DCF employees testified that they were not aware if anyone ever requested that Mother allow a walk-through of her home. Dr. Ibbetson testified that he was unaware of any efforts to place W.E.W. back in Mother's home other than the call he made on July 12 requesting she perform a drug screen. He testified, "As far as I know, the drug test was the first—was the first step," and he was "not aware" of any further action to help Mother obtain the test. He denied that Mother expressed any transportation or cost concerns related to completing the drug screening.

In closing, the State argued there was "a lack of cooperation here on both parts of the parents in trying to get their children returned to them." The State said by failing to provide her home address and failing to complete a drug test "when drug usage is a concern that was alleged in the Petition," Mother failed to cooperate. The State asserted, "If it were me and my children, I would be welcoming them to come into the home. If I had the ability to have my children return to me. That is not occurring here."

The court-appointed guardian ad litem, Mandi Jo Stephenson, said that Mother's contact with W.E.W. while he was staying with Misty was limited—though it was not clear whose fault that was. She noted that Mother refused a drug test on July 1 and failed to comply with a later court order for drug testing. She also stated she "believe[d] [DCF] had at least an affirmed report, and then had Father not complying or cooperating with one, refusing to allow the children to talk to TFI." She also pointed to "allegations of incidents happening in Mom's home when the child was present that were dangerous"; drug-related concerns which could have been cleared up with a clean test; and failure in general to clear up concerns about W.E.W. being in the home. The guardian ad litem argued there was "continued noncooperation with both parents up to this point," that Father had not contacted DCF or TFI for some time, and that there were "concerns" about

8

both parents' drug use. She asserted it was in W.E.W.'s best interests to be adjudicated as a CINC.

Mother's attorney argued the State failed to meet its burden by proof of clear and convincing evidence that W.E.W. was a child in need of care at that time. Similarly, Father's attorney argued the State failed to meet its burden and requested W.E.W. be returned to Mother's custody and that the case be dismissed.

*The district court's ruling*

The district court found the testimony was "relatively consistent, for the most part, between each testifying individual." The court stated:

> "Based on everything I've heard today, it's clear and convincing that [W.E.W.] is without adequate parental care, control or subsistence from his Father, not solely due to financial means. And he was living with Mom largely for those reasons. Living with Mom because of concerns raised from various sources. This safety plan was put in place so that [W.E.W.] went to live with [Misty], to which Mom agreed. And these concerns were about going on—alleged going on in Mom's home—alleged drug use in Mom's home. And so [W.E.W.] was living [with Misty], when [Misty] brought [W.E.W.] to the police station, and [W.E.W.] was placed in police protective custody, taken to juvenile intake. Juvenile intake's allowed and did make the decision to place him temporarily out of parents' custody, in a safe—in their estimation a safe place."

The court then discussed Mother's failure to complete a drug test and explained that at the hearing on July 12, 2024, the parents were ordered to submit to hair follicle drug testing by July 26. The court found Mother filled out an application for appointed counsel dated July 12 and an attorney was appointed July 15. The court stated if Mother had concerns about drug testing, she could have spoken to counsel, TFI, or DCF. The court said Mother's testimony that she did not complete drug testing because she believed

9

it was related to Father's other child had "some validity," but because W.E.W. was "in [Misty's] home, because concerns about drugs, concerns about domestic incidents in [Mother's] home" she should welcome TFI into her home to "see that everything is safe" and she should be willing to submit to testing "so that DCF and TFI can see that she is clean[.]"

The court concluded:

"So, based on everything I've heard today, I think there is clear and convincing evidence. I do find it is more likely than not that [W.E.W.] is a Child in Need of Care for reasons alleged in the Petition, without adequate parental care, control or subsistence, not due solely to a lack of financial means of either of the child's parents. Also without the care and control necessary for his physical, mental or emotional health. So, he is found to be a Child in Need of Care."

The district court published a journal entry reflecting the same conclusion. Mother timely appealed from the CINC adjudication. Mother submitted a brief to this court. After the State failed to submit a brief by the deadline, the court gave overdue notice and a one-month extension for filing. The State failed to submit a brief in the case.

DISCUSSION

Mother appeals the district court's CINC determination, arguing that the court lacked sufficient evidence to support its conclusion and erroneously applied an incorrect legal standard for its finding. A court may only adjudicate a child as a CINC if it finds clear and convincing evidence of at least one of the 14 independent statutory grounds supporting that conclusion. See K.S.A. 2024 Supp. 38-2202(d); see also *In re B.D.-Y.*, 286 Kan. 686, 691, 187 P.3d 594 (2008). The court's finding of a single statutory ground is legally sufficient to support a CINC determination. See *In re F.C.*, 313 Kan. 31, 44, 482 P.3d 1137 (2021) (affirming CINC adjudication where evidence supported one of

two statutory grounds on which district court relied). Clear and convincing evidence is an intermediate standard of proof applied when "'particularly important individual interests or rights are at stake,'" including where the interest is "limitation of parental rights through finding one's child to be in need of care." *In re B.D.-Y.*, 286 Kan. at 697. The fact-finder—in this case, the district court—must find that the truth of the facts asserted is highly probable. 286 Kan. at 705.

The State alleged W.E.W. was a CINC based on two statutory grounds, and the district court found both that W.E.W.:

> "(1) Is without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian; [and]
> "(2) is without the care or control necessary for the child's physical, mental or emotional health." K.S.A. 2024 Supp. 38-2202(d)(1)-(2).

In making a CINC determination, the fact-finder must consider the evidence relevant to the applicable timeframe supporting or refusing that determination. *In re F.C.*, 313 Kan. at 37-39; *In re D.H.*, 57 Kan. App. 2d 421, 434, 453 P.3d 870 (2019). This means that because the district court here relied solely on statutory grounds framed in the present tense—that the child "*is* without" adequate care or control—the adjudication decision must be based on circumstances existing in the present timeframe of the adjudication proceedings. (Emphasis added.) *In re F.C.*, 313 Kan. at 36-39 (citing *In re D.H.*, 57 Kan. App. 2d at 429.

This court reviews the district court's determination that a child is a CINC by considering the evidence in the most favorable light to the State whether "it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the child was a CINC." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court

does not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

I. LACK OF CLEAR AND CONVINCING EVIDENCE

While there may have been sufficient evidence to find that Father was unable to provide adequate care for W.E.W. at the time of the CINC adjudication, the same cannot be said for Mother. The district court stated, "[W.E.W.] is a Child in Need of Care for reasons alleged in the Petition." The petition merely alleged W.E.W. was without adequate care due to *Father's* substance abuse and ongoing legal cases and Misty's unwillingness to continue caring for W.E.W. The CINC petition was noticeably silent regarding Mother—it failed to allege that W.E.W. was a CINC as to Mother. The CINC petition failed to demonstrate or even allege that W.E.W. was a CINC because Mother was unable to provide adequate parental control or adequate care.

Parents have a fundamental liberty interest in making decisions regarding the care, custody, and control of their child. See *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); *In re B.D.-Y.*, 286 Kan. at 697-98. Thus, parents are entitled to due process of law before being deprived of the right to the care, custody, and control of their child. *In re A.S.*, 319 Kan. 396, 402-03, 555 P.3d 732 (2024) (It is "axiomatic" that this right is a fundamental liberty interest protected by the Fourteenth Amendment.); *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007). A fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *In re A.S.*, 319 Kan. at 402; *In re J.D.C.*, 284 Kan. at 166.

The district court's ruling went beyond the allegations in the petition and found that W.E.W. was a CINC because of Mother's conduct. The district court's finding appears to be related to Mother's failure to take a hair follicle drug test and to ensure that someone completed a walk-through of her home. The district court expressed

12

bewilderment at Mother's failure to volunteer to show the State her home was safe and she was drug free—without any substantiated reports that she was unable or unwilling to care for W.E.W. related to drugs or for any other reason. The district court's bewilderment is not a legal basis for finding a child in need of care. See *In re J.L.*, 57 Kan. App. 2d 60, 64-66, 449 P.3d 762 (2019) (requiring an observance of due process before a CINC determination). Here, there was no substantiated allegation that W.E.W. was unsafe, neglected, or harmed while in Mother's care or that Mother's home was unsafe, that Mother used or abused drugs, or that Mother was unable or unwilling to care for W.E.W.

Thorne testified that DCF requested Mother take a drug test "because we had had multiple concerns reported to us for drug use, not just in this investigation but in several other investigations for [Mother] and her other children in Wichita." Thorne was not the only DCF employee to allege concerns about drugs related to Mother. Levy testified that "[t]here had been a lot of talk that [Mother] was supplying [Father], and that there may be drug use in her home as well." Similarly, Dr. Ibbetson testified that he spoke to Mother on July 12 about whether she had any drug involvement because "we had previous cases and a concern for drug activity here in Wichita." Dr. Ibbetson said he indirectly talked to Mother about a "concern" police had about drugs, explaining, "[W.E.W.] had been at her home at the time when there was an incident. And while there was no direct drug stuff reported, there was a concern of that." Due to these "reports" and "concerns," both Levy and Dr. Ibbetson requested that Mother voluntarily complete a drug screen—but neither of them told Mother why they requested the drug screen.

Despite their concerns, none of the DCF employees provided any information to substantiate or corroborate the drug "reports." No one testified about who made the reports of potential drug abuse or sale or when those reports were made; no one testified about the type of drugs they were concerned Mother used or sold; no dates of alleged drug use or sale were provided; no allegations about Mother's conduct supported an

13

inference of drug use or sales; and no one alleged that Mother had contact with law enforcement related to drugs. No DCF employee testified that when they met with Mother via phone or in person she exhibited signs of a substance abuse problem or of being under the influence of drugs. There was no allegation that W.E.W.—who had recently lived with Mother—or Father had concerns about Mother using or selling drugs. In fact, Thorne testified that in May 2024, at the time W.E.W. went to stay with Misty, DCF "had no proof of any, you know, concerns regarding [Mother.]" And regarding allegations that Mother provided drugs to Father, Thorne testified, "[W]e had no 100 percent proof that any of that was happening." Finally, the State's CINC petition did not allege a single incident or issue related to Mother and drug abuse or sales. The testimony from Thorne, Dr. Ibbetson, and Levy appear to all be related to the same March 2024 incident and the same vague and unsubstantiated "concerns" of drug use or sale.

Apparently based on DCF's unsubstantiated and unsupported concerns, the district court ordered Mother to take a hair follicle drug screen by July 26, 2024. Mother failed to complete that drug screen. While it is disconcerting that the district court ordered Mother to complete a drug screen without any allegation that drug use impacted her ability to care for W.E.W., it is troubling that the district court found Mother's failure to complete that single drug screen constituted clear and convincing evidence that W.E.W. was a CINC as to Mother. Compare *In re A.E.S.*, No. 108,584, 2013 WL 2992733, at *5 (Kan. App. 2013) (unpublished opinion) (finding it was proper that a district court did not rely on a parent's substance abuse in the CINC adjudication where the father was coping reasonably well and it was not "out of control nor, more pertinently, impeding his ability to parent"), with *In re A.M.*, No. 125,298, 2023 WL 176722, at *5 (Kan. App. 2023) (unpublished opinion) (pointing to evidence of Father's serious methamphetamine problem which interfered with his parenting).

While multiple reports of drug use, evidence of behavior demonstrating or permitting an inference of drug use, or repeated refusal to comply with court ordered

14

drug screens may create an inference of drug use, those circumstances were not present here. See, e.g., *In re B.J.*, No. 125,727, 2023 WL 5320946, at *6 (Kan. App. 2023) (unpublished opinion) (finding "extensive" evidence supported the finding that Mother was unfit to parent where she had many positive drug screens, 57 no-shows for UAs, 9 uncompleted court-ordered hair follicle tests, and where an expert testified to the negative impact on Mother's ability to parent); *In re P.L.*, No. 120,220, 2019 WL 2063874, at *3 (Kan. App. 2019) (unpublished opinion) (parent's prior admission to drug abuse, blood test evidence, and deliberate and ongoing avoidance of drug testing forged strong circumstantial case for chronic and unresolved drug abuse). In those cases, the child was already adjudicated as a CINC and the parent was required to submit to drug testing as a part of a reintegration plan because the parent's drug use was established as a barrier to reintegration. In *In re P.L.*, a blood test showed the child was born with amphetamines in her system, and in *In re B.J.*, the State established "'almost five years of drug use with no demonstrable period of sobriety or attempts to engage in a prolonged recovery system.'" 2019 WL 2063874, at *1; 2023 WL 5320946, at *6. There was no established drug use in this case creating a barrier to Mother maintaining custody.

Mother failed to complete a drug screen without any evidence of drug use or abuse; without a single allegation that Mother ever neglected W.E.W.; without any allegation that Mother exhibited signs of drug abuse; without any allegation that Mother was unable to care for W.E.W. because of drugs (or any other reason); without any evidence that Mother engaged in harmful conduct related to W.E.W.'s care; without a single witness alleging Mother used drugs; and where multiple witnesses testified that DCF lacked any substantiated reports that Mother abused or sold drugs. This does not constitute clear and convincing evidence that W.E.W. was a CINC as to Mother on the grounds alleged in the petition or stated by the court. Nor do DCF's unsubstantiated "concerns" for Mother's drug use or her involvement in Father's drug use, without any evidence supporting or substantiating those concerns—let alone any evidence that drug use affected her ability to care for W.E.W.—constitute evidence upon which a rational

15

fact-finder could find highly probable W.E.W. was a CINC due to Mother's inability to provide care or control. See *In re G.R.*, No. 123,201, 2021 WL 1045189, at *4 (Kan. App. 2021) (unpublished opinion) ("The district court recognized a causal connection is required between the drug use and the ability to care for the child.").

The district court was also bothered by Mother's failure to facilitate a walk-through of her home and asked, "Why is [Mother] not wanting TFI in her home to see that everything is safe?" Multiple DCF employees, including Dr. Ibbetson, Thorne, and Levy testified that they *never* requested Mother permit them to conduct a walk-through of her home. TFI employee Susan Ratzlaff testified she also never requested a walk-through of Mother's home, she simply requested Mother's address for their meeting to go over paperwork. Mother's desire to meet Ratzlaff in the park on that single occasion is not clear and convincing evidence supporting the court's finding. The truth is that the State—through DCF, TFI, or the court—never requested a walk-through of Mother's home.

The lack of a home walk-through cannot possibly constitute evidence supporting the district court's finding when no one requested a walk-through and where there was no evidence that Mother's home was unsafe. In fact, DCF employees visited Mother's home twice within the six months prior to the CINC adjudication. Thorne testified that a DCF employee had "been into [Mother's] home whenever [W.E.W.] was initially placed with her" in early 2024, and Levy testified that he "was in the front room of her house" after the TDM meeting in May 2024. Neither of those workers reported any concerns about the safety of Mother's home. Additionally, W.E.W. had very recently resided there without any substantiated reports of dangerous, unsafe, or unlivable conditions. Mother's inability to telepathically deduce that her failure to call DCF or TFI and request that they walk through her home—when no one had ever requested a walk-through—is not evidence that her home was unsafe or that she was concealing something nefarious. And it is most certainly not clear and convincing evidence that W.E.W. was a CINC as to Mother—even coupled with Mother's failure to obtain a hair follicle drug screen.

16

Finally, it appears the district court's finding relies on evidence that W.E.W. was residing with Misty for about two months. While W.E.W. residing at a friend's house could be evidence to support its conclusion in some circumstances, the district court wrongly concluded that W.E.W. was placed with Misty because of "concerns about drugs, concerns about domestic incidents in [Mother's] home." That characterization is contradicted by the available evidence. The DCF supervisor testified that DCF had no proof of their concerns when W.E.W. went to stay with Misty. Mother's home was about an hour away, but Misty lived in W.E.W.'s school district and near his friends. Mother only agreed to temporarily let W.E.W. stay with Misty during Father's substance abuse treatment after learning of the fun activities Misty had planned and being reassured W.E.W. would be happy there. It is undisputed that Mother's decision was voluntary, was not compelled for any legal reason, and did not impact her rights, and that DCF told Mother she could withdraw her agreement to the arrangement at her discretion.

Even assuming W.E.W. was residing outside of Mother's home due to DCF's unsubstantiated "concerns," that fact combined with Mother's failure to request a walk-through of her home or complete a drug test under these circumstances does not constitute clear and convincing evidence that W.E.W. was without Mother's parental care, control, or subsistence at the time of the adjudication proceedings. See K.S.A. 2024 Supp. 38-2202(d)(1). Nor does it constitute clear and convincing evidence that W.E.W. was without Mother's care or control necessary for W.E.W.'s physical, mental, or emotional health on the day of the adjudication hearing. See K.S.A. 2024 Supp. 38-2202(d)(2).

Clearly the court, the State, and DCF employees believed they would have acted differently than Mother under these circumstances—bending over backwards and making themselves available for whatever inspection, poking, or hair cutting that anyone requested (or somehow implied was necessary) for the hope of a chance their child would not be taken from their care and custody—but that is not the standard for adjudicating a

17

child in need of care. Not only did DCF employees testify that no one ever told Mother that she risked losing custody of her child for failure to obtain the drug screen or to permit the non-requested home walk-through, but the court and DCF also have an inside understanding of how the process works and likely more trust in the system. Moreover, DCF assured Mother that her allowing W.E.W. to temporarily stay with Misty did not impact her legal rights to the care and custody of W.E.W. Finally, and critically, any finding that it was somehow Mother's burden to disprove unsubstantiated, unsupported rumors that she used or sold drugs just to avoid deprivation of her parental rights misconstrues the legal standard for adjudicating her child as a CINC.

The evidence demonstrates that Mother could likely use some assistance—particularly with transportation and perhaps in other ways. But when viewed in the most favorable light to the State, there is not evidence to support a finding that it was highly probable W.E.W. was a CINC due to Mother's inability to provide for his care or well-being.

## II.  INCORRECT BURDEN OF PROOF APPLIED

Mother also argues the district court applied the wrong standard of proof when it determined W.E.W. was a CINC as to Mother. Whether the district court applied the correct legal standard raises a question of law over which appellate courts exercise unlimited review. *In re Parentage of R.R.*, 317 Kan. 691, 695, 538 P.3d 838 (2023). In its ruling, the district court stated, "So, based on everything I've heard today, I think there is clear and convincing evidence. I do find it is *more likely than not* that [W.E.W.] is a Child in Need of Care for reasons alleged in the Petition." (Emphasis added.) Here, "more likely than not" appears to be an expression of the preponderance of the evidence standard. See *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 1 ("'Preponderance of the evidence' is evidence which shows that the truth of the facts asserted is more probable than not."). However, the applicable standard—requiring clear and convincing evidence that W.E.W.

18

is a CINC—is a higher standard than the preponderance standard; it requires that the evidence shows the truth of the facts asserted is "highly probable." 286 Kan. 686, Syl. ¶¶ 2-3; see also K.S.A. 38-2250. The district court's statement creates ambiguity about whether it applied the correct standard to its determination.

CONCLUSION

In adjudicating W.E.W. a CINC, the district court apparently relied on an erroneous legal standard. Additionally, in an effort for completeness and to ensure the efficacy of future proceedings regarding W.E.W., this court also finds that the district court's finding that W.E.W. was a CINC at the time of the adjudication hearing is not supported under the correct legal standard. Mother was available and willing to care for W.E.W. at the time of the adjudication hearing, and her fundamental right to the care and control of W.E.W. could only be affected by clear and convincing evidence that she was unable to care for W.E.W.

W.E.W. had lived with Mother less than six months before the CINC adjudication and there was no evidence that W.E.W. suffered a lack of care or control while in Mother's care. The CINC petition failed to allege any deficiency related to Mother. Likewise, the State failed to demonstrate clear and convincing evidence at the CINC adjudication that Mother was unable to provide adequate parental care, control, or subsistence, or that W.E.W. was without the care or control necessary for physical, mental, or emotional health when with Mother. The district court's determination that W.E.W. is a CINC under K.S.A. 2024 Supp. 38-2202(d)(1) and (d)(2) is reversed. This case is remanded with directions that the district court vacate that ruling and proceed in a manner consistent with this opinion.

Reversed and remanded with directions.